**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

```
------------------------------------------------------------  x
PALLADIAN PARTNERS, L.P.; HBK                                 :
MASTER FUND L.P.; HIRSH GROUP LLC;                            :
and VIRTUAL EMERALD                                           :
INTERNATIONAL LIMITED,                                        :
                                                             :
                          Plaintiffs,                         :     Civil Action No. 1:25-cv-01954-CKK
                                                             :
           - against -                                       :
                                                             :
THE REPUBLIC OF ARGENTINA,                                    :
                                                             :
                          Defendant.                          :
------------------------------------------------------------  x
```

**DECLARATION OF THE RT. HONOURABLE LORD GOLDSMITH KC**

I, the Right Honourable Lord Goldsmith KC, declare as follows under penalty of perjury under the laws of the United States of America pursuant to 28 U.S.C. § 1746:

1.     I am retained by Sullivan & Cromwell LLP, the Republic of Argentina's counsel in the above-captioned action, to make this Declaration as an expert on English law.

2.     I have been asked to give my independent opinion on whether under English Law the waiver of sovereign immunity made by the Republic of Argentina (the "**Republic**") in a Trust Indenture dated 2 June 2005, as amended (the "**Indenture**") and associated Terms and Conditions of the Global Security representing the Euro denominated GDP-Linked Securities (ISIN XS0209139244) (the "**T&Cs**" and the "**Global Security**", respectively) extends to these U.S. proceedings to enforce the English judgment.

3.     As I explain below, in my opinion, under English law, the waiver of immunity does not, on its proper interpretation, apply to these enforcement proceedings. I thus respectfully, but clearly, disagree with the conclusions of the Right Honourable Lord Neuberger

in his Declaration of 2 March 2026 (the "**Neuberger Declaration**", references to which are in the form "**Neuberger ¶paragraph**"). For completeness, I also do not consider that the Republic would, under English law, be estopped from denying (and thus bound to accept) that the waiver extends to these proceedings.

4.     I have considered the authorities listed at Annex A to the Neuberger Declaration. The other authorities that I refer to in this Declaration are listed in Annex A below and are attached hereto in an indexed compendium, attached as **Exhibit 1**. The Republic has also provided me with certain documents which I have considered for the purposes of this Declaration. I set out a full list of such documents at Annex B below.

5.     I am being compensated on an hourly basis for my work in this case, including the preparation of this Declaration. My compensation does not depend on the outcome of this case.

## I.     PROFESSIONAL BACKGROUND AND QUALIFICATIONS

6.     I was called to the Bar of England & Wales in 1972 and, except as set out below, have practised as a barrister since. I was appointed Queen's Counsel (now King's Counsel) in 1987. I have also been admitted to several other bars either on a permanent basis (Northern Ireland, Belize, BVI, Paris, New South Wales) or an ad hoc basis (including Gibraltar, Singapore, St Kitts and Nevis, Cayman).

7.     I initially practised from the leading barristers' set Fountain Court (then first based at 2 Crown Office Row), specializing principally in commercial law, and later public and international law.

8.     In 1995 I was elected Chairman of the Bar of England and Wales. In 1999 I was appointed to the upper chamber of the UK Parliament – the House of Lords. Two years later, in 2001, I was appointed the Attorney General of the United Kingdom and Northern Ireland (the

chief legal adviser of the UK Government), a position in which I served until 2007. As Attorney General I advised and represented the UK Government in many cases in courts in the UK and internationally. Unlike many of my predecessors and successors during my tenure I frequently argued the cases in court myself.

9.      In 2007 I returned to private practice as the Chair of European and Asian Litigation at the global law firm Debevoise & Plimpton LLP, practising from the London Office of the firm where I took the position of co-Managing Partner of that office. In that role I continued to practise principally in commercial law in litigation and arbitration, continuing to advise and personally appear in court and in arbitration both in the UK and overseas.

10.      At the end of December 2025, I left the partnership of Debevoise & Plimpton LLP and recommenced practice on 1 January 2026 from Fountain Court Chambers where I practise as arbitrator and counsel.

11.      During my career I have appeared in the courts of England & Wales at all levels up to and including the House of Lords, Supreme Court and Privy Council as well as a number of overseas jurisdictions. I also sat as a part-time judge as a Recorder in the Crown Court and a Deputy High Court Judge during the period between 1996 and 2001.

12.      I regard the issues raised in these proceedings, so far as concerns English law, to be well within my expertise and experience.

13.      For further details I refer to my CV which is attached as **Exhibit 2**.

II.    OPINION

14.      As noted above, I have been asked to opine on whether, under English law, the Republic's waiver of sovereign immunity in Paragraph 19 of the T&Cs (and also section 12.10 of the Indenture) (the "**Waiver**") extends to the Plaintiffs' claims in the action seeking recognition

and enforcement of the English Judgments, summary judgment, costs, and interest (the "**Complaint**").

15. In summary, I consider that an English Court would conclude that the Waiver does not extend to such claims. As will become apparent, my opinion rests on two main points. First, the clear, specific language the parties chose to use in the Waiver. Second, the fact that the parties did not use, in the Waiver, language that they used elsewhere that would achieve the interpretation the Plaintiffs argue for. Lord Neuberger's arguments based on general wording elsewhere (specifically, paragraph 11 of the T&Cs), or the supposed results of the Republic's interpretation, do not outweigh those two fundamental points.

16. I divide the rest of this opinion into four sections:

(a) First, in section II.A, I set out the relevant principles of contractual interpretation under English law.

(b) Second, in section II.B, I address the application of those principles.

(c) Third, in section II.C, I address additional points raised by Lord Neuberger on whether the Republic would be precluded, in proceedings before an English Court, from arguing certain points.

(d) Fourth, in section III, I set out my overall conclusions on the matters on which I have been asked to opine.

A. **The Applicable Principles of Interpretation Under English Law and the Key Elements of the Background Against Which They Fall to be Applied.**

17. The question of interpretation that I have been asked to give my opinion on must be resolved by reference to the terms of the Indenture and T&Cs.[1]

---

[1] In this regard I agree with Lord Neuberger's statement in the Neuberger Declaration ¶12 (first sentence).

18.     As Lord Neuberger notes,[2] the approach, under English law, to interpreting contracts is set out in the Supreme Court's decisions in Rainy Sky SA v Kookmin Bank, Arnold v Britton, and Wood v Capita Insurance Services Ltd.[3] I deal separately below with what precisely those cases establish. In addition to those leading decisions, there is also useful guidance to be gleaned from certain lower-court decisions on the proper place of, and weight to be given to, commercial common sense in the exercise of interpretation. I refer to this guidance below.

19.     Turning to the relevant principles of contractual interpretation, the Court's task is to identify the objective intention of the parties by reference to what a reasonable person having all the background knowledge which would have been available to the parties would have understood the parties to mean by the language used in the contract.[4]

20.     As Lord Neuberger notes, the Court identifies that objective meaning by focusing on the meaning of the relevant words in their documentary, factual, and commercial context, and the meaning is to be assessed in the light of (i) the natural and ordinary meaning of the section; (ii) other relevant provisions in the contract; (iii) the overall purpose of the section and the contract; (iv) the facts and circumstances known or assumed by the parties at the time that the document was executed; (v) commercial common sense; but (vi) disregarding subjective evidence of any party's intentions.[5]

---

[2]     Neuberger Declaration ¶12 (second sentence).

[3]     Rainy Sky SA v Kookmin Bank [2011] 1 WLR 2900 (attached as Exhibit 1 to Lord Neuberger's Declaration); Arnold v Britton [2015] AC 1619 (attached as Exhibit 2 to Lord Neuberger's Declaration); Wood v Capita Insurance Services Ltd [2017] AC 1173 (attached as Exhibit 3 to Lord Neuberger's Declaration).

[4]     Neuberger ¶12(a) (citing Rainy Sky at [14]; Arnold at [15]).

[5]     Neuberger ¶12(b) citing Arnold at [15].

21.     The natural and ordinary meaning of the words is, thus, the starting point of the interpretative exercise.  In many cases, it is also the end of the matter (as I explain in further detail below).  This is borne out by the following guidance from the Courts and which I consider is worth emphasising:

22.     *First*, the Court must not undervalue the parties' contractual language, or search for, or construct, drafting infelicities to escape the natural meaning of contractual terms. Lord Neuberger's guidance on this point in [17] and [18] of <u>Arnold</u> is instructive and I set it out in full (emphasis added):

> "*17     First, **the reliance placed in some cases on commercial common sense and surrounding circumstances (e g in Chartbrook [2009] AC 1101, paras 16–26) should not be invoked to undervalue the importance of the language of the provision which is to be construed. The exercise of interpreting a provision involves identifying what the parties meant through the eyes of a reasonable reader, and, save perhaps in a very unusual case, that meaning is most obviously to be gleaned from the language of the provision.** Unlike commercial common sense and the surrounding circumstances, the parties have control over the language they use in a contract. And, again save perhaps in a very unusual case, the parties must have been specifically focussing on the issue covered by the provision when agreeing the wording of that provision.*
>
> *18     Secondly, when it comes to considering the centrally relevant words to be interpreted, I accept that the less clear they are, or, to put it another way, the worse their drafting, the more ready the court can properly be to depart from their natural meaning. That is simply the obverse of the sensible proposition that the clearer the natural meaning the more difficult it is to justify departing from it. However, **that does not justify the court embarking on an exercise of searching for, let alone constructing, drafting infelicities in order to facilitate a departure from the natural meaning.** If there is a specific error in the drafting, it may often have no relevance to the issue of interpretation which the court has to resolve.*"

23.     *Second,* the extent to which the Court may draw conclusions from the factors beyond the natural and ordinary meaning of the words varies from case to case.[6] In Plaintiffs' English claims concerning the Indenture and the T&Cs, the Court of Appeal (in

---

[6] As was made clear in <u>Wood</u>, at [10] and [13].

Palladian Partners LP v The Republic of Argentina[7] (the "**CA Decision**")) made it clear that, applying English law, textualism was the most useful tool available to the English Court.[8] Lord Justice Popplewell (with whom the other members of the Court agreed) explained that the Court must determine the meaning of what the parties actually said, not what they meant to say, and that other factors that the Court may have regard to in the interpretative exercise *"must not be permitted to undervalue the importance of the language used"*.[9]

24.    He also explained that central terms of the Securities "must have been focused on by the parties and those skilled professionals involved in their negotiation and drafting" and the language in which such a terms were expressed "will be the primary source available to purchasers on the secondary market in understanding [their] effect".[10]   In other words, the contractual documents were: "the type of agreement which can be successfully interpreted principally by textual analysis unless it lacks clarity.  Textualism is, in this case, the most useful tool, although not the only one".[11]

25.    The Waiver is a provision falling within the category of a central term to the Indenture and the T&Cs: it was drafted by sophisticated parties assisted by skilled professionals who would have been focused on its precise language. They would have been focused on it because the Waiver is important to the Indenture and the T&Cs because it deals with (among other things)

---

[7]    Palladian Partners LP v The Republic of Argentina [2024] EWCA Civ 641.

[8]    For the avoidance of doubt, I do not intend to and do not express any view on the correctness of the Court of Appeal's rulings in the CA Decision on the disputed term in that case (termed the "Adjustment Provision").  I refer to the CA Decision merely to explain the English law principles that the English Court applied when construing the Indenture and the T&Cs.

[9]    CA Decision, at [58], citing Lord Neuberger's guidance in Arnold at [17].

[10]    CA Decision, at [64].

[11]    Ibid.

which judgments may be enforced, where they may be enforced, who may enforce them, and which categories of assets are immune from execution. Further, its language would be the primary source for purchasers in the secondary market to understand its effect.[12]

26.     I would also add to the summary of the principles at paragraph 20 above that the Court will disregard post-contractual statements and conduct, except in specific circumstances,[13] none of which are said to apply here. That is important given some of Lord Neuberger's references to positions taken and not taken by the Republic in front of the English Courts. They could at most go to an allegation of issue estoppel or abuse of process. Under English law, those statements are irrelevant to the interpretation of the Indenture and T&Cs as a pure exercise in contractual interpretation, since they are by their very nature post-contractual.

27.     I now turn to the "*unitary*" or "*iterative*" process. As Lord Neuberger explains, this process involves checking the rival meanings of contractual terms against the contract as a whole and investigating their commercial consequences.[14] I would, however, draw attention to important guidance on carrying out, and on the weight to be attached to the outcome of, that iterative process.

---

[12]   I also note that per the CA Decision at [22] – [27], the relevant background also included the Republic's previous sovereign debt default, and the restructuring of its debt. A reasonable observer would, in those circumstances, expect the parties to focus closely on any waiver of sovereign immunity.

[13]   Summarised in The Commissioners for Her Majesty's Revenue and Customers v Secret Hotels2 Limited (formerly Med Hotels Limited) [2014] UKSC 16 at [33]. Briefly, subsequent conduct and statements can be relied on: (1) in support of an argument the contract is a 'sham'; (2) in support of a claim for its rectification; (3) in support of an allegation the agreement was varied or replaced; (4) to show that the written contract represented only part of the totality of the parties' contractual relationship.

[14]   Neuberger ¶12(c) first sentence.

28.    In particular, Lord Neuberger's statement that "[t]*he meaning that better coheres with those considerations* [i.e., other provisions of the contract, and the commercial consequences of the rival interpretations] *is likely to be preferred*" goes too far as a bald proposition.

(a)    Respectfully, this proposition (for which, as stated, he cites no authority) runs counter to Lord Neuberger's own decision in Arnold (key passages from which I have set out above at paragraph 22). There, the issue was how to construe an escalation clause in leases for holiday chalets. The result was to approve a construction which led to a service charge so high it could be described as "*an absurdly high figure*" (at [42]) or "*absurd*" (at [143]). Applying the actual words used would, as Lord Neuberger put it, avoid "*the much more satisfactory outcome in common sense terms*" ([62]). Yet despite all of that, the majority of the Supreme Court followed the natural meaning of those actual words.

(b)    Generally, therefore, the iterative process must not be allowed to diminish the importance of the language used by the parties. Where the natural meaning of the words can be identified, the Court will ordinarily only depart from that meaning in exceptional circumstances.[15] That is especially so here, where the Court is concerned with tradeable securities created and issued under documents drafted by skilled professionals.[16] The iterative process must still happen, but the words have primacy.[17]

---

[15]    Carillion Construction Limited v Emcor Engineering Services Limited [2017] EWCA Civ 65 at [46]–[53].

[16]    Wood at [13].

[17]    See paragraphs 21–23 above. I also note that although the CA Decision acknowledged that in a number of respects the commercial consequences of the Republic's construction "might be regarded as preferable to those which follow from the Claimants' construction", in applying

29.    As for commercial common sense, as Lord Neuberger notes (at Neuberger ¶12(d)), regard can be had to it when interpreting contractual terms and, where there are two possible interpretations, the Court is entitled (but not bound) to prefer the one more consistent with commercial common sense. However, and as Lord Neuberger rightly points out, where the language used is unambiguous the Court must apply it.[18]

30.    In any event, in interpreting a contract, considerations of commercial common sense must be treated with some care. The compressed account Lord Neuberger gives of the role of commercial common sense (at Neuberger ¶12(d)) undervalues important guidance from the Courts on the caution to be exercised when seeking to rely on commercial common sense as an interpretative tool, and the limits on its weight and utility in the interpretive exercise.[19]  That guidance provides four important caveats to Lord Neuberger's account.

31.    The first such caveat is that the Court can only give effect to the interpretation which it sees as more consistent with commercial common sense *if it can decide* which interpretation makes more commercial common sense.[20]

---

English law principles to the disputed term, it ultimately preferred the Claimants' construction. CA Decision, at [105]; see also [88].

[18]    Neuberger ¶12(d) citing Rainy Sky at [21]–[23]).

[19]    I note that Lord Neuberger quotes (at Neuberger ¶12(d)) from his decision in Arnold (at [20]) for the proposition that commercial common sense is a "*very important factor to take into account when interpreting a contract*". The quoted text omits key context.  In fact it is preceded by "*while*" and then, the same paragraph – which should be read in full – goes on to warn against the Court rejecting the natural meaning of a provision just because it appears very improvident for one of the parties to have agreed (even without the benefit of hindsight), or rewriting the contact to try to relieve a party from the consequences of their imprudence or poor advice.

[20]    BMA Special Opportunity Hub Fund Ltd & Ors v African Minerals Finance Ltd [2013] EWCA Civ 416 at [24]; Cottonex Anstalt v Patriot Spinning Mills Ltd [2016] 1 CLC 28 at [57]–[58] (Hamblen J, as he then was; now Lord Hamblen, Justice of the Supreme Court).

(a)    The Courts recognise that even specialist commercial judges are not always the most commercially-minded or commercially-experienced people, or always well-placed to judge where commercial common sense lies. Thus, they should exercise caution before forming a firm view on this issue.[21]

(b)    There may also be reasonable arguments both ways as to which interpretation makes more commercial sense (or both interpretations may produce surprising and uncommercial results). Then, recourse to commercial common sense takes matters no further.[22]

32.    The second caveat is that even if the Court can say that one interpretation is more consistent with commercial common sense, it still may not be entitled to conclude that is the *right* interpretation where the language used is clear and unambiguous.[23]

33.    The third caveat is that there is extensive guidance as to how commercial common sense is – and is not – to be understood:

(a)    Commercial common sense is not a matter of what the judge might have considered a sensible answer to the parties' conundrum, or judged from just one party's point of view.[24]

---

[21]  The World Symphony [1992] 2 Lloyd's Rep 115 at 117; AMEC Foster Wheeler Group Ltd v Morgan Sindall Professional Services Ltd 166 ConLR 130 at [17]; Skanska Rashleigh Weatherfoil Ltd v Somerfield Stores Ltd [2006] EWCA Civ 1732 at [22] (Lord Justice Neuberger, as he then was), and Tartsinis v Navona Management Company [2015] EWHC 57 (Comm) at [54] (Leggatt J, as he then was, now Lord Leggatt, Justice of the Supreme Court).

[22]  See, e.g., Kahn v Dunlop Haywards (DHL) Ltd [2007] EWHC 2659 (QB) at [65]; Enterprise Inns Plc v Palmerston Associates Limited [2011] EWHC 3165 (Ch) at [64]–[66]; Aston Hill Financial Inc v African Minerals Finance Ltd [2012] EWHC 2173 (Comm) at [31] and [35] (affirmed on appeal [2013] EWCA Civ 416); Cottonex at [57].

[23]  See paragraph 29 above.

[24]  BMA Special Opportunity Hub Fund Ltd at [24].

(b)     Commercial common sense is not to be invoked retrospectively. It is judged as at the date the parties contracted, by reference to how matters could or would have been perceived by the parties or reasonable people in their position then. That a contractual arrangement, if interpreted according to the natural meaning of the language used, may work out badly or even disastrously for one party is beside the point under English law.[25]

34.     The fourth caveat is that there is much guidance (largely cautionary) on the proper use of, and proper weight to be given to, commercial common sense in interpretation:

(a)     It is not for a party who relies on the words used to establish that those words effect a sensible commercial purpose.[26] It should be assumed, as a starting point, that the parties understood the purpose which was effected by the words they used; and that they used those words because, to them, that was a sensible commercial purpose.[27]

(b)     Better fit with commercial common sense is not an overriding criterion.[28] In other words, it does not (without more) override, or outweigh the other factors taken into account in the interpretative process. Contractual interpretation cannot be reduced to finding the meaning (or available meaning) that most comports with commercial common sense.

(c)     As explained in paragraph 22 above, in Arnold at [17] Lord Neuberger rightly cautioned against using commercial common

---

[25]    See Arnold at [19].

[26]    Amlin Corporate Member Ltd v Oriental Assurance Corp [2014] 2 Lloyd's Rep 561 at [45].

[27]    Ibid.

[28]    BMA Special Opportunity Hub Fund Ltd at [24].

sense to undervalue the importance of the language of the provision being interpreted.

(d)    Indeed, commercial common sense may not help in the detailed, granular interpretation of the language of the provision being interpreted. As Lord Hodge held in Wood at [28]: "*Business common sense is useful to ascertain the purpose of a provision and how it might operate in practice. But in the tug o' war of commercial negotiation, business common sense can rarely assist the court in ascertaining on which side of the line the centre line marking on the tug o' war rope lay, when the negotiations ended.*"

(e)    Generally, if the Court can identify the words used as having a 'natural' meaning, then it should exercise caution in departing from that meaning.[29] In such a case, the Court will ordinarily only depart from that meaning "*only in exceptional circumstances*".[30] Indeed, there is authority which states that in such a case departing from the natural meaning of the words can only be justified if commercial absurdity would otherwise ensue.[31]

(f)    Where a party seeks to have the Court interpolate words (or delete them)[32] based on commercial common sense or commercial purpose, then the Court must be satisfied of two things before it is able to do so. First, that the words used produce a result which is so uncommercial[33] that the parties could not have intended it. Second,

---

[29]    Skanska at [22].

[30]    Carillion at [46].

[31]    Thompson v Goblin Hill Hotels Ltd [2011] UKPC 8 at [18] (albeit this case concerned articles of association, and predates Arnold and Wood).

[32]    Powell v General Electric Company [2005] EWHC 644 (Ch) at [31].

[33]    Indeed in Amlin Corporate Member at [45] Gloster LJ phrased the terms of the result being so "*commercially nonsensical*" it could not have been intended.

that the parties did intend some other commercial purpose which can be identified with confidence. If, and only if, those two conditions are satisfied, can the court introduce words which the parties have not used to give the contract the meaning which the parties must have intended.[34]

35.     For completeness, I note that Neuberger ¶13 refers to Re Sigma Finance Corporation[35] which contains passages warning against an over-literal interpretation of one provision without regard to other context, and suggesting that in complex documents there will be some drafting infelicities. I do not read those passages as establishing some general principle under English law by which tradeable financial instruments should be interpreted primarily by reference to matters other than the language in them, or with scant regard for their text. Rather, the cited passages are just what they appear to be: warnings against an *over*-literal approach to interpretation.  Thus, the Court of Appeal, taking full account of Re Sigma Finance Corporation, still gave textual analysis primacy (with regard to the English law question of interpretation it was faced with.[36]

**B.     The Application of the Relevant Principles of Interpretation**

36.     The key issue here is what is the meaning and extent of the waiver of immunity. As the commentary above shows, the starting point must be the words of the Waiver in paragraph 19 of the T&Cs ("**Paragraph 19**"), which reads:

> "*Waiver of Immunity. (a) Subject to Paragraph 20, to the extent that the Republic or any of its revenues, assets or properties shall be entitled, in any jurisdiction in which any Specified Court is located, in which any Related Proceeding may at any time be brought against it or any of its revenues, assets or properties, or in any*

---

[34]    Amlin Corporate Member Ltd at [45].

[35]    Re Sigma Finance Corporation [2010] 1 All ER 571 (attached as Exhibit 4 to Lord Neuberger's Declaration).

[36]    CA Decision at [62] and [64].

*jurisdiction in which any Specified Court or Other Court is located in which any suit, action or proceeding may at any time be brought solely for the purpose of enforcing or executing any Related Judgment, to any immunity from suit, from the jurisdiction of any such court, from set-off, from attachment prior to judgment, from attachment in aid of execution of judgment, from execution of a judgment or from any other legal or judicial process or remedy, and to the extent that in any such jurisdiction there shall be attributed such an immunity, the Republic irrevocably waives such immunity to the fullest extent permitted by the laws of such jurisdiction, including the United States Foreign Sovereign Immunities Act of 1976 (the "Immunities Act") (and consents to the giving of any relief or the issue of any process in connection with any Related Proceeding or Related Judgment as permitted by applicable law, including the Immunities Act),* provided, however, *that such waiver shall not extend to and the Republic shall be immune in respect of and in relation to any suit, action or proceeding or enforcement of any Related Judgment against (i) assets that constitute freely available reserves pursuant to Sections 5 and 6 of Law No. 23,928, as amended, (ii) property in the public domain located in the territory of the Republic of Argentina that falls within the purview of Sections 2337 and 2340 of the Civil Code of the Republic, (iii) property located in or outside the territory of the Republic that provides an essential public service, (iv) property (whether in the form of cash, bank deposits, securities, third party obligations or any other methods of payment) of the Argentine government, its governmental agencies and other governmental entities relating to the performance of the budget, within the purview of Section 67 of Law No. 11,672 ( t.o. 1999), as supplemented by Sections 94, 95 and 96 of Law No. 25,401, (v) property entitled to the privileges and immunities of the Vienna Convention on Diplomatic Relations of 1961, (vi) property not used for commercial activity that is entitled to the immunities of the Immunities Act, (vii) property used by a diplomatic, governmental or consular mission of the Republic or (viii) property of a military character or under the control or a military authority or defense agency of the Republic.*

*(b) This waiver of sovereign immunity constitutes only a limited and specific waiver for the purpose of the Securities of this Series and the Indenture and under no circumstances shall it be interpreted as a general waiver of the Republic or a waiver with respect to proceedings unrelated to the Securities of this Series or the Indenture. Insofar as this waiver relates to the jurisdiction in which an Other Court is located, the Republic extends it solely for the purpose of enabling the Trustee or a Holder of Securities of this Series to enforce or execute a Related Judgment.*"

37.     The Waiver is closely circumscribed. Per Paragraph 19(b), it is expressly "*a*

*limited and specific waiver*". One must therefore consider carefully just what waiver has been

made. Further, the Waiver draws a clear distinction between proceedings in a Specified Court[37] (i.e., England or Argentina) and proceedings in an Other Court:[38] here, a US court.

38.    The relevant words of the Waiver where the proceedings are in an "*Other Court*" i.e., a court other than a "*Specified Court*" (the courts of England and Argentina) are those in Paragraph 19(b)'s second sentence: "*Insofar as this waiver relates to the jurisdiction in which an Other Court is located, the Republic extends it solely for the purpose of enabling the Trustee or a Holder of Securities of the Series to enforce or execute a Related Judgment.*"

39.    The terms "*Trustee*" and "*Holder of Securities*" are defined terms.[39] As to the key definitions here:

(a)    "*Trustee*" is defined as The Bank of New York Mellon ("**BNYM**").[40]

(b)    "*Holder of Securities*" is defined as a person "*in whose name a Security shall be registered*".[41]

40.    As a matter of fact, which I understand to be common ground, the sole Holder at all relevant times was the Bank of New York Depositary (Nominees) Limited ("**BNYDN**").

---

[37]    Defined in paragraph 17 of the T&Cs.

[38]    Defined in paragraph 17 of the T&Cs.

[39]    In English law when the parties give a specific meaning to a contractual definition that agreed meaning should be given effect. That is so even if it is at odds with the meaning that might be given to the term in ordinary parlance. *See* Lewison, THE INTERPRETATION OF CONTRACTS, 8th Ed 2024 at [5.91]. A previous edition was cited with approval in e.g., Rockliffe Hall v Travellers Insurance [2021] Bus LR at [35] per Cockerill J; Bellini (N/E) Ltd Trading as Bellini v Brit UW Limited [2023] 573 Lloyds Rep at [30] per Ms Clare Ambrose sitting as a Deputy High Court Judge.

[40] Paragraph 1(a) of the T&Cs.

[41] Paragraph 1(c) of the T&Cs; section 1.1 of the Indenture.

41.    Applying therefore the agreed definitions to Paragraph 19(b), it reads as follows:

> "*Insofar as this waiver relates to the jurisdiction in which* [a US Court] *is located, the Republic extends it solely for the purpose of enabling the* [BNYM] *or* [BNYDN] *to enforce or execute a Related judgement.*"

42.    Those words are, in my opinion, clear and unambiguous. A potential purchaser of an interest in these Securities, for example, who was concerned as to where a judgment on them could be enforced and looking for what waiver of immunity had been given as to US courts would see the answer clearly stated in Paragraph 19(b). The choice of the parties to use the words "*limited and specific waiver*" and "*solely*" would be seen as emphasising that.

43.    As these proceedings are not brought by either BNYM (i.e., the Trustee) or BNYDN (i.e., the Holder of the Securities) to enforce a Related Judgment, the Republic has not (under English law) in my opinion waived its immunity in them.

44.    I would also note that, under English law, as immunity is a common law right of a sovereign State, clear words are needed for the waiver. Generally, clear words are needed to contractually restrict or waive valuable rights or remedies that otherwise would exist.[42]  Here, the words used clearly do not include enforcement actions by the Plaintiffs in this Court.

45.    The contrary view taken by the Plaintiffs and supported by Lord Neuberger depends on the last sentence of Paragraph 11 of the T&Cs ("**Paragraph 11**"). In full, Paragraph 11 states:

> "*Enforcement. Except as provided in Section 4.9 of the Indenture with respect to the right of any Holder of a Security to enforce the payment of any amounts due hereunder on any Payment Date (as this Security may be amended or modified pursuant to Paragraph 22), no Holder of a Security shall have any right by virtue of or by availing itself of any provision of the Indenture, the GDP-Linked Securities*

---

42    Triple Point Technology Inc v PTT Public Co Ltd [2021] AC 1148 especially per Lord Leggatt at [106] and following.

*Authorization or the Securities to institute any suit, action or proceeding in equity or at law upon or under or with respect to the Indenture, the GDP-Linked Securities Authorization or the Securities, or for any other remedy hereunder or under the GDP-Linked Securities Authorization or the Indenture, unless:*

> *(a) such Holder previously shall have given to the Trustee written notice of default and of the continuance thereof with respect to the Securities;*
>
> *(b) the Holders of not less than 25% in aggregate notional amount of the Outstanding Securities shall have made written request to the Trustee to institute such action, suit or proceeding in its own name as Trustee under the Indenture;*
>
> *(c) such Holder or Holders shall have provided to the Trustee such reasonable indemnity and/or security as it may require against the costs, expenses and liabilities to be incurred therein or thereby;*
>
> *(d) the Trustee for 60 days after its receipt of such notice, request and provision of indemnity and/or security shall have failed to institute any such action, suit or proceeding; and*
>
> *(e) no direction inconsistent with such written request shall have been given to the Trustee pursuant to Section 4.11 of the Indenture;*

*it being understood and intended, and being expressly covenanted by every Holder of Securities with every other Holder of Securities and the Trustee that no one or more Holder shall have any right in any manner whatever by virtue or by availing itself of any provision of the Indenture, the GDP-Linked Securities Authorization or ·of the Securities to affect, disturb or prejudice the rights of any other Holder of Securities or to obtain priority over or preference to any other such Holder, or to enforce any right under the Indenture, the GDP-Linked Securities Authorization or under the Securities, except in the manner herein provided and for the equal, ratable and common benefit of all Holders of the Securities. Subject to the foregoing, for the protection and enforcement of this Paragraph, each and every Holder and the Trustee shall be entitled to such relief as can be given either at law or in equity. The Republic expressly acknowledges, with respect to the right of any Holder to pursue a remedy under the Indenture, the GDP-Linked Securities Authorization or the Securities, the right of any beneficial owner of Securities to pursue such remedy with respect to the portion of this Global Security that represents such beneficial owner's interest in this Security as if Certificated Securities had been issued to such beneficial owner."*

46.    I find myself respectfully in disagreement with Lord Neuberger that these words (and similar words at the end of section 4.8 of the Indenture), which are not found in a provision dealing with (and even on Plaintiffs' interpretation, not found in a provision dealing

otherwise, or explicitly with) sovereign immunity, override what is otherwise the clear and unambiguous meaning of the Waiver in Paragraph 19, and provide that the Waiver also applies when proceedings are brought in an Other Court by someone who is not a Trustee or Holder but a beneficial owner of interests in Securities.[43]

47.    My reasons for reaching that conclusion are detailed below.

### 1.    The Language of the Waiver

48.    First, the language used (and indeed not used) in the Waiver, and in particular in the key second sentence of Paragraph 19(b) supports that conclusion. As explained above, the parties' choice of language is of fundamental importance. Here, the parties' choice of clear, unambiguous, and specific language in that part of the Waiver weighs overwhelmingly in favour of the Republic's interpretation of the Waiver. The fundamental importance of the language of the Waiver explains why it is the right starting point for the analysis. I note that it is also Lord Neuberger's first port of call in Neuberger ¶17. There, he rightly acknowledges the "*force in the Republic's contention*", if one focuses on the specific language of the second sentence of Paragraph 19(b), of an interpretation by which the Waiver does not extend to attempts by beneficial owners of Securities to enforce Related Judgments in Other Courts. As can be seen, the second sentence of Paragraph 19(b) itself refers to "*the Trustee or a Holder*", but not to beneficial owners.

49.    On its face, the second sentence of Paragraph 19(b) defines the boundary of the Waiver with respect to actions to enforce Related Judgments in Other Courts by reference to a purpose ("*solely for the purpose of...*"), with the content of that purpose defined by two factors.

---

[43]    Further references in this Declaration to beneficial owners of interests in Securities are, unless stated otherwise, to non-Trustee, non-Holder beneficial owners (i.e., beneficial owners who have not satisfied the requirements to become a Trustee or become a Holder via registration, in accordance with paragraph 1(c) of the T&Cs).

The first is the end ("...*to enforce or execute a Related Judgment...*"). The second is identification of the potential claimant, i.e., who must be pursuing that end ("...*the Trustee or a Holder of Securities of this Series...*"). If a claim is brought by someone who is not a Trustee or Holder of Securities of this Series, then it is not for the relevant purpose. It certainly is not "*solely*" for that purpose. Thus, the Waiver does not extend to their claim. I note also that this gives sensible content to "*solely*". It signifies that the requirements that follow are strict, and with respect to Other Courts do not extend beyond where they are met. I underline that the extension is not just for the purpose of enforcing or executing a Related Judgement but for a purpose which meets the two factors referred to above, namely: (i)  enforcement or execution of a Related Judgment; (ii) by a Trustee or Holder of Securities.

50.    Clearly Paragraphs 19(a) and (b) must be read together to determine the extent of the waiver agreed.  In particular, the second sentence of Paragraph 19(b) provides the detail of the extent of the immunity waived in proceedings outside England and Argentina.  The parties did <u>not</u> include words such as "*beneficial owners of interests in the Securities*" or any other similar language in that sentence.

51.    The significance of the language which the parties did choose to use in the second sentence of Paragraph 19(b) is elevated by this point. It is important that the parties had available to them and chose to use elsewhere – but not in the Waiver – language apt to describe beneficial owners of Securities. In other words, the parties could and did use elsewhere language that was perfectly apt to achieve the result that the Plaintiffs ask the Court to reach, yet did not use that language in the Waiver. For example:[44]

---

[44]    See also section 4.8 of the Indenture ( "*beneficial holder*[s] *of Debt Securities*"); Exhibit G (Form of GDP-Linked Securities), paragraph 2(a) ("*the beneficial owners of this Security*",

(a)    Section 2.5(c) of the Indenture states that *"[e]xcept as specified below or with respect to the terms of Debt Securities of any Series, owners of beneficial interests in a Global Security will not be entitled to have any of the individual Debt Securities of such Series represented by such Global Security registered in their names, or be entitled to receive physical delivery of any such Debt Securities in definitive form and will not be considered the owners or Holders thereof under this Indenture"*. This shows the parties having available to them, and making use of, particular language which does not appear in the Waiver when they wish to refer to beneficial owners of interests in a Global Security. Indeed, that language is used alongside, and in juxtaposition to "*Holders*". I also note that the next part of the paragraph refers to "*beneficial interests in a Global Security*".

(b)    Paragraph 2(a) of the T&Cs refers to "*beneficial owners of this Security*", and "*such beneficial owner*", as well as "*beneficial ownership interests in this Security*", and "*such beneficial ownership interests*".

(c)    The end of Paragraph 11 of the T&Cs refers to *"any beneficial owner of Securities"*, "*such beneficial owner's interest in this Security*" and *"such beneficial owner"*.

52.    A reasonable observer would thus note that the parties had available to them, and did use elsewhere, particular language where they wished to refer to beneficial owners of Securities, but did not use it in the Waiver. This is a simple point as to how language is used

---

and "*beneficial ownership interests*"), and paragraph 9 ("*any beneficial owner of Securities*", "*such beneficial owner's interest*", and to "*such beneficial owner*").

and understood. It would not normally require the support of authority in an English Court, but there are many examples of the Courts relying on this type of reasoning.[45]

53.     These points, based on the language which the parties did, and did not, choose to use in the Waiver would be persuasive to an English Court.

### 2.     Other Provisions of the Agreement

54.     Turning to the other relevant provisions in the Indenture and T&Cs, they are more supportive of the Republic's interpretation of the Waiver than the Plaintiffs'.

55.      I have already set out in paragraphs 51–53 above why I consider that certain other provisions of the Indenture and T&Cs point towards the Republic's interpretation of the Waiver, rather than the Plaintiffs', being right. To those can be added the following:

> (a)     Section 2.5(c) of the Indenture, and the text stating "*So long as the Depositary for a Global Security, or its nominee, is the registered owner of such Global Security, such Depositary or such nominee as the case may be, will be considered the sole owner or Holder of the Securities represented by such Global Security for all purposes under this Indenture. Except as specified below or with respect to the terms of Debt Securities of any Series, owners of beneficial interests in a Global Security will not be entitled to have any of the individual Debt Securities of such Series represented by such Global Security registered in their names, or be entitled to receive physical delivery of any such Debt Securities in definitive form and will not be considered the owners or Holders thereof under this Indenture*". I have addressed the references to "*beneficial interests*" and "*owners*"

---

45   Amherst v Walker (James) Goldsmith & Silversmith Ltd [1980] 1980 WL 264752 at 3; Barking and Dagenham LBC v Terrapin Construction Ltd 74 ConLR 100 at 110–111; PT Berlian Laju Tanker TBK v Nuse Shipping Ltd [2008] 1 CLC 967 at [24]; Colour Quest Ltd v Total Downstream UK plc [2011] 3 All ER 793 at [15]; Blankley v Central Manchester and Manchester Children's University Hospital's NHS Trust [2014] EWHC 168 (QB) at [41].

*of beneficial interests*" and their significance in paragraph 51 above. It is also, however, important that this provision makes it clear that, generally, beneficial owners of interests in Global Securities are not treated as owners or Holders thereof. That is the general rule under the Indenture (and the T&Cs of the Securities issued pursuant to it). Maintaining a clear delineation between the Holder and beneficial owners of interests in Global Securities is consistent with that. Collapsing that distinction (as the Plaintiffs' and Lord Neuberger's approach would) is a marked departure from it.

(b)    See also sections 6.3, and 12.2 of the Indenture, again drawing a distinction between Holders and other persons.

### 3.    *Plaintiffs' Reliance on Paragraph 11 of the T&Cs*

56.    The argument put against the Republic's interpretation, however, is that on that interpretation there would then be an inconsistency with the final sentence of Paragraph 11. Respectfully, I disagree. In short, without the final sentence of Paragraph 11 a beneficial owner would have no legal entitlement to bring proceedings even in the Specified Courts as they would lack the legal right to do so. They would lack privity of contract, creating a standing problem. That was what defeated the investor claimants in Secure Capital SA v Credit Suisse AG.[46] The final sentence of Paragraph 11 removes that problem. This is a different issue from whether the Republic has waived its immunity, which is specifically dealt with in Paragraph 19.

57.    The structure of the final sentence of Paragraph 11 fits my interpretation. It begins by referring to "*the right of any Holder to pursue a remedy under the Indenture, the GDP-*

---

[46]    Secure Capital SA v Credit Suisse AG [2017] 2 CLC 428 at [46]–[53], [57].  See in particular [52] ("*The overall effect of these express provisions is clear.  The only party with a right to sue Credit Suisse is BNYM as holder of the Notes…*"), and note also [55] where a route to avoid the conclusion that as a result the investor claimant had no standing to sue was rejected.

*Linked Securities Authorization or the Securities*". So it refers to the right of a Holder to seek a remedy. It does not refer to <u>every</u> right or benefit they may have, or even <u>every</u> right or benefit they may have in connection with bringing a claim. Then, it refers to the beneficial owner's right "*to pursue such remedy*". Here, "*such remedy*" is on its face a reference back to the remedy the Holder might pursue. That right is then limited in scope to being "*with respect to the portion of this Global Security that represents such beneficial owner's interest in this Security*". The words "*as if Certificated Securities had been issued to such beneficial owner*" then simply clarify that the beneficial owner can bring the claim as if it were a direct contracting party with respect to securities equal in amount to the portion of the Global Security representing its interest. The beneficial owner can, under certain circumstances, claim for sums under the T&Cs, or seek equitable or declaratory remedies. But they do not, without more, acquire (and are not treated as acquiring) the benefit of every waiver of positive defences granted contractually to a Holder. Plaintiffs' view wrongly expands the beneficial owner's entitlement beyond a right to "*pursue such remedy*", to capture a positive waiver of a particular defence (state immunity in Other Courts) granted specifically only in favour of the Trustee and a Holder.

58.    My view, outlined above:

(a)    Fits with the parties drafting the final sentence of Paragraph 11 as they did, rather than using language that they used elsewhere, which would achieve the result that Lord Neuberger suggests the parties intended. In this respect I also note that they did not, for example, simply state that with respect to the portion of the Global Security representing its interest, the beneficial owner would have <u>all</u> the rights of a Holder.

(b)    Fits with the lack of any express reference to beneficial owners in the second sentence of Paragraph 19(b).

-24-

(c)     Represents a more limited departure from, and is more consistent with, the general approach of not granting rights to beneficial owners, revealed by the provisions in paragraph 55 above.

(d)     Allows both paragraphs to be read together without any contradiction.

59.     On this view, the final sentence of Paragraph 11 would still grant a meaningful right to beneficial owners. The waiver of sovereign immunity for Specified Courts in Paragraph 19(a) is not limited to "*the Trustee or a Holder*" as it is (by the second sentence of Paragraph 19(b)) for Other Courts. This is a fundamental distinction between the waiver of immunity in Specified Courts and in Other Courts. It is only in relation to the latter that the Waiver is limited to attempts by the Trustee or Holder(s) to enforce a Related Judgment. So beneficial owners could still sue the Republic in a Specified Court (or seek to enforce a Related Judgment in one).

60.     Even if, contrary to my analysis above, an English Court *did* read the final sentence of Paragraph 11 as operating on its face as Lord Neuberger suggests, then the specific wording in the second sentence of Paragraph 19(b) would qualify the (on that view) general wording of Paragraph 11. Generally, where a contract contains general and specific provisions, the former will be read with the latter so that where the facts fall within the scope of the specific provisions, the general provisions give way.[47] Then, the supposed inconsistency between Paragraph 19(b) and the final sentence of Paragraph 11 would fall away.

---

[47]    Golden Fleece Maritime Inc v ST Shipping & Transport Inc [2008] EWCA Civ 584 at [23]; A & V Building Solutions Limited v J & B Hopkins Limited [2023] EWCA Civ 54 at [46] ("*where a contract contains general provisions and specific provisions which potentially contradict each other, the specific provisions will be given greater weight*").

61.    I thus disagree with the fundamental premise Lord Neuberger relies on in this part of his argument, set out in the final sentence of Neuberger ¶18, through to Neuberger ¶21, and in the first sentence of Neuberger ¶26. The supposed inconsistency relied on in Neuberger ¶22 simply does not arise. Even if (contrary to my primary analysis) it did, then it would be avoided by the mechanism set out in paragraph 60 above, rather than by reading the second sentence of Paragraph 19(b) out of the T&Cs. The same points also answer any other point made as to consistency between the provisions of the T&Cs (rather than commercial common sense), if any are made, in the final sentence of Neuberger ¶28(a), or in Neuberger ¶28(b).

### 4.    Consistency Between Paragraphs 19(a) and 19(b) of the T&Cs

62.    The rest of Neuberger ¶35 does seek to make a consistency point. There, it is said that because the first sentence of Paragraph 19(b) does not take away rights granted elsewhere, it is unlikely that the second sentence does. With respect, that point lacks substance.

(a)    It does not follow that because one sentence of a clause does not have a particular effect, another sentence (or even the next one) does not. Nor does it follow that it is inherently unlikely that the next sentence lacks such effect.

(b)    The premise of the point – that the second sentence of Paragraph 19(b) "*cut*[s] *down … benefits or rights…granted elsewhere*" – is wrong. The Republic could, in many jurisdictions, without more rely on sovereign immunity. By the Waiver, the Republic limited its ability to do so. Paragraph 19 – including Paragraph 19(b) – sets out the extent to which the Republic does so. Put another way, it sets out the extent to which the Republic gives up valuable legal rights.[48]

---

[48]    See, e.g., Triple Point Technology Inc at [106] and following.

Casting Paragraph 19(b) simply as taking away valuable rights granted elsewhere is wrong.

(c)    In any event, Paragraph 19 sets out the waiver of sovereign immunity, and the second sentence of Paragraph 19(b) is an important part of that (indeed an emphatically important part as the word "*solely*" shows), explaining and delineating the scope of the waiver, referred to in Paragraph 19(a), for Other Courts. Any suggestion that a reasonable observer would consider that on the Republic's interpretation of the Waiver, the second sentence of Paragraph 19(b) does anything surprising, or anomalous given its location, fails.

63.    Neuberger ¶36 contends that his view that the second sentence of Paragraph 19(b) should be given no more than confirmatory effect "*dovetails well with the notion that the reference to "a Holder" in the sentence refers or includes references to a beneficial owner*". Respectfully, this just underscores that on the Plaintiffs' proposed construction of the Waiver, the second sentence of Paragraph 19(b) has no effect. In fact, the point that on the Plaintiffs' interpretation of the Waiver Paragraph 19(b) has no effect (or, to use Lord Neuberger's euphemism in Neuberger ¶35, is merely "*confirmatory*") is another matter undermining that interpretation. While, under English law, avoiding redundancy, and giving effect to every part of the contract, varies in value depending on the type of contract and the particular drafting in play, generally the English Court will try to give effect to every part of the contract. As explained in A & V Building Solutions Limited at [46]: "*...when interpreting a contract, all parts of the contract must be given effect where possible, and no part of it should be treated as inoperative or surplus...*".[49]

---

[49] A & V Building Solutions Limited [2023] EWCA Civ 54 at [46].

64.     I would further note – against the idea "*that the reference to 'a Holder' in the sentence refers or includes reference to a beneficial owner*" – that the term "*Holder*" is a defined term (at paragraph 1(c) of the T&Cs and section 1.1 (on page 3) of the Indenture); in neither case is the definition extended to include beneficial owners (though it could easily have been if the parties had intended that extended definition).

### 5.     *Commercial Common Sense and Consequences*

65.     I cannot agree with the suggestion (in Neuberger ¶¶26, 28(a), 28(c), 33 and 35) that it would be arbitrary, inexplicable, or perverse for the Republic to waive sovereign immunity for beneficial owners in Specified Courts, but not in Other Courts.

66.     In more detail, while it is not for the Republic to prove a commercial rationale or purpose, where it relies on the language used by the parties,[50] an English judge would conclude that there was a plausible rationale for the Republic to retain its sovereign immunity as against beneficial owners in Other Courts. Paragraph 19(b) shows that the parties intended that there be a difference between Specified Courts and Other Courts. What is more, it is rational for the parties to choose a different approach to waiver of immunity in Specified Courts and in Other Courts, and to want to limit the scope for a multiplicity of enforcement actions in many jurisdictions around the world.

> (a)     Waiving sovereign immunity against Trustees, Holders, and beneficial owners in Specified Courts (i.e., the Courts of England and Argentina) exposes the Republic to claims in just two jurisdictions, albeit potentially by several parties. The English Courts, at least, also have a range of mechanisms to prevent a multiplicity of proceedings. They can stay proceedings in front of them or consolidate multiple proceedings into one set of

---

[50]   See paragraph 34(a) above.

proceedings. They can order multiple sets of proceedings to be tried together. They can also schedule hearings so that overlapping proceedings are heard in sequence rather than in parallel. They can even injunct a party from starting or continuing parallel proceedings brought in breach of a jurisdiction clause like paragraph 17, or if it is otherwise just and equitable to do so. The potential for the Republic to face a multiplicity of parallel proceedings is thus limited.

(b)    Waiving immunity in Other Courts only for enforcement proceedings by the Trustee and Holders limits the possibility of the Republic facing a multiplicity of (potentially simultaneous) enforcement proceedings, from many parties,[51] across <u>multiple</u> jurisdictions.  It also reduces the scope for multiple parties to engage in a race to enforce a judgment in multiple jurisdictions. That centralisation of enforcement can benefit beneficial owners. Were the waiver of sovereign immunity for Other Courts read as the Plaintiffs suggest, then the possibility of many beneficial owners of interests in Securities pursuing enforcement proceedings in any number of jurisdictions would be increased. Unlike the Specified Courts, those jurisdictions would not be designated in advance. Similarly, whether such Other Courts would have and exercise any powers to limit the opportunities for parallel proceedings is also unknown.  The issues in front of each such Other Court are likely to include whether under that jurisdiction's own rules for recognition and enforcement of judgements, the Related Judgment is to be recognised and enforced. That will not necessarily raise overlapping issues with other enforcement proceedings in a different Other Court

---

[51]    I can see that with regard to Certificated Securities or definitive Debt Securities, it could be that there are many Holders. At least then, however, that is a scenario which the Republic has clearly undertaken the risk of multiple Holders seeking to enforce across multiple jurisdictions at once by issuing multiple such Securities having agreed to the Waiver in the terms that it did.

(looking to its own rules on those points) sufficient to induce either Other Court to, for example, stay its proceedings. This difficulty is exacerbated by the fact that the identities of the (potentially many) beneficial owners of interests in Securities may shift over time as interests change hands. Meanwhile, their status as beneficial owners may not necessarily be straightforward to verify.[52] Avoiding this is a sensible rationale for approaching a waiver of sovereign immunity extending to enforcement proceedings in Other Courts rather differently to the waiver before Specified Courts.

(c)     In addition, in the context of the English State Immunity Act 1978, the English Courts recognise three important things. First, that there is a distinction between adjudicative and enforcement immunity.[53] Second, that waiving the former does not necessarily entail the latter.[54] Third, that there are greater sensitivities attached to enforcement and execution against a state.[55] Thus a reasonable observer reading the Indenture and T&Cs would not consider it surprising, arbitrary, or uncommercial for a state to be willing to waive immunity with respect to enforcement or execution more narrowly than with respect to adjudication.

67.     An English Court would not therefore conclude that the commercial consequences of the rival interpretations weighed in favour of the Plaintiffs' interpretation of the Waiver, as part of the iterative process of interpretation. Similarly, it would not conclude that it

---

[52]   I understand that in fact the identify of ultimate beneficial owners of Securities would be known only if they chose to identify themselves.

[53]   See also Alcom v Republic of Columbia [1984] 1 AC 580 at 600C (Lord Diplock).

[54]   See e.g., Svenska Petroleum Exploration v Lithuania [2007] QB 886 at [117].

[55]   See, General Dynamics United Kingdom v Libya [2021] 2 CLC 241 at [59], per Lord Lloyd-Jones: "[enforcement] *may give rise to even greater sensitivities in view of the fact that the power of the forum state may be enlisted to seize assets of the defendant state*".

could identify the Plaintiffs' interpretation as making more commercial sense than the Republic's. In those circumstances the English Court would place the greater weight on the language used by the parties, especially in the Waiver.

68.     I also note that in substance the points relied on in these passages of the Neuberger Declaration amount to arguments that the Waiver should be understood as permitting beneficial owners of Securities to sue in Other Courts to avoid uncommercial consequences. That is in reality an attempt to add the words "*or beneficial owner of Securities of this* Series" into, or (conceivably) to delete the words "*for the purpose of enabling the Trustee or a Holder of Securities*" from, the second sentence of Paragraph 19(b). Yet as set out in paragraph 34(f) above, if a party to an English law governed agreement seeks to have the Court interpolate words or delete them based on commercial common sense or commercial purpose, then the Court must be satisfied of two things. First, that the words actually used produce a result so uncommercial that the parties could not have intended it. Second, that the parties did intend some other commercial purpose which can be identified with confidence. An English Court would not find those conditions were met here.

69.     I would also add that the point relied on in the second and third sentences of Neuberger ¶28(a) (that beneficial owners' rights would be rendered nugatory by the plain words of the Waiver) is not correct. As explained in paragraph 59 above on the Republic's interpretation of the Waiver, the beneficial owners could (as they did) sue the Republic in a Specified Court (here, the English Court), recover substantial sums (as they have), and seek to enforce the judgment in that Specified Court (as they have, in England). They could also seek to have the Trustee or Holder take enforcement steps in Other Courts.

70.     That leaves the point in Neuberger ¶28(b) that Form B of the Indenture's statement that a Certificated Security carries all the same benefits as other Debt Securities. Yet that relies on the premise that Paragraph 11 is meant to place a beneficial owner in precisely the same position as a Holder, and for the reasons I have given in paragraphs 56–61 above, that premise is false (which also disposes of Neuberger ¶29 insofar as it refers to the final sentence of Paragraph 11).

71.     Further, with respect to the point based on Form B, I do not see the natural meaning of the phrase on the face of Form B to the Indentures relied upon (namely that Certificated Security would "*in all respects be entitled to the same benefits as other Debt securities under the Indenture and* [T&Cs]") as including a right to defeat a particular defence based on immunity by reason of a waiver granted to Trustees and Holders.

72.     Whilst I accept that as a matter of language the word "benefits" is capable of a wide meaning which could cover some right in litigation, in my opinion, the phrase is more likely to be construed in context as relating to the benefits inherently applicable to the Security and in particular compared with other securities including the benefits in the Indenture to receive payment of principal and interest (section 3.1); to receive that without deduction of taxes or other charges (section 3.2) to have an available office for payment (section 3.3); as to the mode of payment (section 3.5) etc.  Those are benefits which fit well within the first meaning of the word "*benefit*" in the Oxford English Dictionary ("*an advantage or profit gained from something*"). If the (objective) intention had been to say that a beneficial owner would have all the same rights, including to defeat defences in litigation as the Holders of other Debt Securities, that could have been stated more clearly and naturally in other words.  So, if necessary to avoid inconsistency, that phrase would in my opinion be read in that way, particularly if taken with the other points I have

raised which militate against the extension of the meaning of Paragraph 19 which Plaintiffs contend for.

### 6.    Conclusion

73.    It follows from the above that under English law, on its proper interpretation, the Waiver does not extend to attempts by beneficial owners of securities to enforce a Related Judgment in an Other Court. As regards Other Courts, the Waiver extends only to proceedings brought solely to enable the Trustee or a Holder to enforce or execute a Related Judgment.

### C.    Lord Neuberger's Additional Points Concerning Whether the Republic Would Be Precluded from Taking Certain Points Before an English Court

74.    In Neuberger ¶¶23–25, Lord Neuberger makes several points related to the Republic's conduct in the English proceedings, which he relies on to suggest (among other things) that "*the Republic would . . . be barred from contending in any English proceedings that the Plaintiffs were not, at the very least, to be treated as "Holder*[s]" *within the meaning of ss. 4.8 and 4.9*".  Lord Neuberger similarly makes the point (at Neuberger ¶41) that because the Republic admitted that the Plaintiffs could pursue a remedy under paragraph 11 of the T&Cs/s. 4.8 of the Indenture, "*any argument by the Republic to the contrary would, at least as a matter of English Law, be an abuse of process on the ground that it has been already litigated and determined by the English Courts*".

75.    In so far as these points are argued by the Plaintiffs to affect the true construction of the Waiver, I do not agree that they assist in that exercise.  I have explained above (at paragraph 26) why post-contractual statements and conduct are generally irrelevant to the proper interpretation of the Waiver (or indeed of the Indenture and T&Cs generally).

76. I am instructed that Plaintiffs are making an argument that the Republic is here estopped from denying it has waived immunity for the purpose of these proceedings, by reason of what it said or did in the English proceedings, but not by reference to English law. It is not for me to address contentions made by Plaintiffs in this regard but I do make a few short points in response to Lord Neuberger's comments summarized in paragraph 74 above, which are made by reference to English law. My comments thus assume that English law (as opposed to US federal law) apply to questions of estoppel.

77. As Neuberger ¶24, footnote 24, describes, the requirements for issue estoppel were summarised by Lord Justice Clarke in Good Challenger Navegante SA v Metalexportimport SA:[56] "*in order to establish an issue estoppel four conditions must be satisfied, namely (1) that the judgment must be given by a* [court] *of competent jurisdiction; (2) that the judgment must be final and conclusive on the merits; (3) that there must be identity of parties; and (4) that there must be identity of subject matter, which means that the issue decided by the* [other] *court must be the same as that arising in the English proceedings*".  I would add two points by way of elaboration to this summary:

> (a) *First* the issue, the determination of which is said to generate the estoppel, must be an essential step of the reasoning in the first proceedings, such that the decision cannot stand without it.[57]

---

[56] Good Challenger Navegante SA v Metalexportimport SA [2004] 1 Lloyd's Rep 67 at [50] (attached as Exhibit 7 to Lord Neuberger's Declaration); applied recently by the Court of Appeal in Hulley Enterprises v Russian Federation [2026] KB 1 at [36]–[41] (attached as Exhibit 8 to Lord Neuberger's Declaration).

[57] New Brunswick Railway Co Ltd v British & French Trust Corp Ltd [1939] AC 1 at 41–43; Mustafa Erdem Baldudak v Mark Matteo [2024] EWHC 167 (Ch) at [109].

(b)    *Second* the issue must be the same as between the two sets of proceedings.[58] Some authorities add a gloss of "*substantially*" before the "*same*" element of this.[59]  In any case, however, a deduction from an earlier decision which did not decide the issue will not suffice.[60]

78.    I was not involved in the English proceedings and would need to study materials for those proceedings closely to form a view whether the Republic would be estopped from contending that the Plaintiffs were not to be treated as Holders within the meaning of sections 4.8 and 4.9 of the Indenture.

79.    However, and with respect to Lord Neuberger, I do not consider that he is addressing the relevant question that these proceedings raise. Even if the Republic were estopped in relation to the question of whether for the purposes of sections 4.8 and 4.9 of the Indenture the Plaintiffs are or to be treated as "*Holders*", would not mean that the Republic was estopped from asserting that the Waiver, with respect to Other Courts, does not extend to attempts by persons who are not in fact Holders (as defined, and for the purposes of the Waiver) to enforce Related Judgments in Other Courts.

80.    I am instructed that no defence was raised in those proceedings by the Republic based on its sovereign immunity, nor was the issue addressed by the trial court or the Court of Appeal in the English proceedings. That is not surprising as in the English Court the

---

[58]   New Brunswick Railway Co at 41–43; Baldudak at [109]; Skatteforvaltningen at [56], [58], [59]–[60] and [80].

[59]   E.g., PJSC National Bank Trust v Boris Mints [2022] EWHC 871 (Comm) at [47].

[60]   The Joint Administrators of Lehman Brothers Holdings PLC (in Administration) v LB GP No.1 Limited (in Liquidation) [2023] EWHC 3056 (Ch) at [99].

question of whether the Republic has extended its Waiver in Other Courts to beneficial holders would not arise as the English Court is a Specified Court.

## III.    CONCLUSION

81.    With regard to the Waiver and proceedings in Other Courts, the language used by the parties in Paragraph 19(b) is the start, and, here, the end of the interpretative process. Under English law, the authorities are clear that in the type of contractual documents considered here, the text comes first. Here, the words used in the second sentence of Paragraph 19(b) set out the scope of the Waiver with regard to Other Courts, and they are clear and unambiguous. The general wording in the final sentence of Paragraph 11 cannot override, amend, or undo that clear, specific language used in the second sentence of Paragraph 19(b). Nor can that clear, specific language be, in substance, rewritten or read out of the Indenture and T&Cs based on (misplaced) allegations as to the rationality of the results that giving effect to that language would lead to. Thus an English Court would conclude that the Waiver does not extend to beneficial owners' attempts to enforce Related Judgments in Other Courts.

I declare under penalty of perjury pursuant to the laws of the United States of America that the foregoing is true and correct.

Executed on March 27, 2026
London, United Kingdom

_____
The Right Honourable Lord Goldsmith

-36-

## ANNEX A – LIST OF AUTHORITIES

| No. | Name and Citation |
|---|---|
| 1. | Palladian Partners LP v The Republic of Argentina [2024] EWCA Civ 641 |
| 2. | The Commissioners for Her Majesty's Revenue and Customs v Secret Hotels2 Limited [2014] UKSC 16 |
| 3. | Carillion Construction Limited v Emcor Engineering Services [2017] EWCA Civ 65 |
| 4. | BMA Special Opportunity Hub Fund & Ors v African Minerals Finance [2013] EWCA Civ 416 |
| 5. | Cottonex Anstalt v Patriot Spinning Mills [2016] 1 CLC 28 |
| 6. | The World Symphony [1992] 2 Lloyd's Rep |
| 7. | AMEC Foster Wheeler Group Ltd v Morgan Sindall 166 Con. L.R. 130 |
| 8. | Skanska Rashleigh Weatherfoil Ltd v Somerfield Stores Ltd [2006] EWCA Civ 1732 |
| 9. | Tartsinis v Navona Management Company [2015] EWHC 57 (Comm) |
| 10. | Kahn v Dunlop Haywards (DHL) Ltd [2007] EWHC 2659 (QB) |
| 11. | Enterprise Inns PLC v Palmerston Associates Limited [2011] EWHC 3165 (Ch) |
| 12. | Aston Hill Financial Inc v African Minerals Finance Limited [2012] EWHC 2173 (Comm) |
| 13. | Amlin Corporate Member Ltd v Oriental Assurance Corp [2014] 2 Lloyd's Rep 561 |
| 14. | Thompson v Goblin Hill Hotels Limited [2011] UKPC 8 |
| 15. | Powell v General Electric Company [2005] EWHC 644 (Ch) |
| 16. | Lewison, THE INTERPRETATION OF CONTRACTS, 8th ed 2024 (*Excerpt*) |
| 17. | Rockliffe Hall Ltd v Travellers Insurance Co Ltd [2021] Bus. L.R. 656 |
| 18. | Bellini (N/E) Ltd v Brit UW Ltd [2023] Lloyd's Rep IR 573 |
| 19. | Triple Point Technology v PTT Public Co Ltd [2021] AC 1148 |
| 20. | Amherst v Walker (James) Goldsmith & Silversmith Ltd (1980) 1980 WL 264752 |
| 21. | Barking and Dagenham LBC v Terrapin Construction Ltd 74 ConLR 100 |
| 22. | PT Berlian Laju Tanker TBK & Anor v Nuse Shipping Ltd [2008] 1 CLC 967 |
| 23. | Colour Quest v Total Downstream UK [2010] 3 All ER 793 |
| 24. | Blankley v Central Manchester and Manchester Children's University Hospitals NHS Trust [2014] EWHC 168 (QB) |
| 25. | Secure Capital SA v Credit Suisse AG [2017] EWCA Civ 1486 |

-38-

| No. | Name and Citation |
| --- | --- |
| 26. | Golden Fleece Maritime v ST Shipping & Transport Inc [2008] 1 CLC 861 |
| 27. | A&V Building Solutions Limited v J&B Hopkins Limited [2023] EWCA Civ 54 |
| 28. | State Immunity Act 1978 |
| 29. | Alcom Ltd v Republic of Colombia [1984] AC 580 |
| 30. | Svenska Petroleum Exploration AB v Government of the Republic of Lithuania [2007] QB 886 |
| 31. | General Dynamics United Kingdom v Libya [2021] 2 CLC 241 |
| 32. | New Brunswick Railway Co Ltd v British & French Trust Corp Ltd [1939] AC 1 |
| 33. | Mustafa Erdem Baldudak v Mark Matteo [2024] EWHC 167 (Ch) |
| 34. | Skatteforvaltningen v MCML Ltd [2025] EWCA Civ 371 |
| 35. | PJSC National Bank Trust v Boris Mints [2022] EWHC 871 (Comm) |
| 36. | The Joint Administrators of Lehman Brothers Holdings PLC (in Administration) v LB GP No.1 Limited (in Liquidation)  [2023] EWHC 3056 (Ch) |

## ANNEX B – LIST OF DOCUMENTS PROVIDED

| No. | Document | Date |
|---|---|---|
| *Plaintiffs' Complaint* | | |
| 1. | Complaint | June 23, 2025 |
| 2. | Exhibit 1:  High Court Order | June 9, 2023 |
| 3. | Exhibit 2:  Court of Appeal Order | June 21, 2024 |
| 4. | Exhibit 3:  2005 Trust Indenture | June 2, 2005 |
| 5. | Exhibit 4:  2010 Supplemental Indenture | April 30, 2010 |
| 6. | Exhibit 5:  2005 Global Security | June 2, 2005 |
| 7. | Exhibit 6:  Supreme Court Order | October 8, 2024 |
| 8. | Exhibit 7:  Letter from S&C to QE | May 9, 2025 |
| 9. | Exhibit 8:  Letter from QE to S&C | June 12, 2025 |
| 10. | Exhibit 9:  Claim Form | August 9, 2019 |
| 11. | Exhibit 10:  Republic's Acknowledgment of Service | August 23, 2019 |
| 12. | Exhibit 11:  Amended Claim Form | December 11, 2019 |
| 13. | Exhibit 12:  English Court of Appeal Order (LoC) | March 22, 2024 |
| 14. | Exhibit 13:  English Court of Appeal Order dated  (LoC Drawdown) | January 14, 2025 |
| *Republic's Motion to Dismiss* | | |
| 15. | Republic's Motion to Dismiss the Complaint | February 2, 2026 |
| 16. | Declaration of Robert J. Giuffra, Jr. | February 2, 2026 |
| 17. | Exhibit 1:  Excerpts of Amended Particulars of Claim ¶¶ 2, 54(c) | December 11, 2019 |
| *Plaintiffs' Opposition to Motion to Dismiss* | | |
| 18. | Plaintiffs' Opposition to Motion to Dismiss | March 2, 2026 |
| 19. | Declaration of Aidan Alexander O'Rourke | March 2, 2026 |
| 20. | Exhibit 1:  Re-Re-Amended Particulars of Claim | September 14, 2022 |
| 21. | Exhibit 2:  Re-Re-Amended Defense | September 23, 2022 |
| 22. | Exhibit 3:  The Civil Procedure Rules 1998 | N/A |
| 23. | Exhibit 4:  J.P. Morgan Account Statement re HBK Master Fund | August 8, 2019 |
| 24. | Exhibit 5:  Morgan Stanley Client Statement re Argentine Republic Government International Bond, | For the period July 1-31, 2019 |
| 25. | Exhibit 6:  Euroclear Bank Letter | August 13, 2019 |
| 26. | Exhibit 7:  CBH Portfolio Statement on Virtual Emerald International Ltd. | As of November 5, 2019 |
| 27. | Exhibit 8:  J.P. Morgan Account Statement re HBK Master Fund | June 22, 2021 |
| 28. | Exhibit 9:  Excerpt of the Operating Procedures of Euroclear System | October 2020 |
| 29. | Exhibit 10:  High Court of Justice Judgment | April 5, 2023 |

| 30. | Exhibit 11: Republic's Skeleton Argument for June 8-9, 2023 Consequentials Hearing | June 6, 2023 |
|---|---|---|
| 31. | Exhibit 12: Email from S. Ritchie to Christopher Palin, et al. | July 26, 2023 |
| 32. | Exhibit 13: Email from Q. Song to Christopher Palin, et al. | July 14, 2023 |
| 33. | Exhibit 14: Republic's Draft Grounds of Appeal | June 6, 2023 |
| 34. | Exhibit 15: Republic's Notice and Grounds of Appeal | June 30, 2023 |
| 35. | Exhibit 16: Court of Appeal Order | February 22, 2024 |
| 36. | Exhibit 17: Banco Santander Letter of Credit | April 3, 2024 |
| 37. | Exhibit 18: Court of Appeal Judgment | June 12, 2024 |
| 38. | Exhibit 19: Trustee's Notice to Holders | February 27, 2025 |
| 39. | Exhibit 20: High Court of Justice Order | July 25, 2025 |
| 40. | Declaration of RT. Honourable Lord Neuberger | March 2, 2026 |
| 41. | Declaration of Thomas Webley | March 2, 2026 |
| *Additional Documents* | | |
| 42. | Claimants' Skeleton for Issue Concerning the Trustee | November 14, 2022 |
| 43. | Trustee's Written Closing for Trial | November 14, 2022 |
| 44. | Letter from Quinn Emanuel to the English Court | July 24, 2025 |
| 45. | Email from English Court Clerk | July 25, 2025 |